Please tell us your name and who you represent My name is David Grund and I represent John And good morning, your honors. My name is Michelle Dotner and I represent the appellee Alan Reidy, who is here with us today, and along with my co-counsel Arnold Stein and Thomas Scalente All right. And Mr. Grund, how much time do you need for argument? And I will tell you both, we've we've all read the briefs. We're very familiar with the case, the issues, the facts. So how much time would you like? I don't think I'll need more than 10 minutes, your honor. And I'd like to reserve about five minutes of that time for questions, if that's okay with you, Mr. Grund, and then we'll move on to the next panel, if that's okay with you, Mr. Reidy, and then we'll move on to the next panel, if that's okay with you, Mr. Addox. Okay. So we'll say 15 minutes for you. That's fine. Thank you, your honor. All right. And just keep in mind that the microphone in front of you is for recording purposes only. It does not amplify your voices, so if you both keep your voices up. During your arguments, we'd appreciate it. I and Ms. Jochner, you may have a seat. Mr. Grund, you ready to proceed? Thank you. And if the court please, and before I begin, I'd like to congratulate Judge Walker on his appointment. Your honor, the conclusion to be reached in this case is that the trial court left a gaping hole in the dissolution judgment by excluding for the court's consideration approximately $7 million in marital property. You're talking about the Naples condominium held in trust. I'm sorry, Judge. I didn't hear you. You're talking about the Naples condominium held in trust and the portion of Ms. Reedy's interest in her business that was held in another entity. I am, your honor. Okay. So as I read the record, during the trial, in advance of the trial, counsel for Mr. Reedy joined in the motion in limine and said those two pieces of property are outside this proceeding. Right. So how is that not a waiver of that issue? Great question. I was trial counsel. I was the one who joined in that. Let's keep in mind that that was done after the judge, the trial judge, already ruled not to allow us to file the amendment. Right. So that my concern was, and as I expressed it to the court, that despite the because the subject matter would be addressed by the court, the value, the disposition of that 70% interest or 60-whatever percent interest that was left to be decided by the court, someone would argue after the fact that it's rest judicata. In fact, I was aware that there were a number of cases, mostly involving malpractice, attorney malpractice, where in fact the subject of attorney negligence came to appear in a dissolution case and thereby the defense was made in a subsequent malpractice case against the attorney that rest judicata was applied. Right. And so you preserved your client's ability to litigate his law division claims. Correct. He's claiming that the QPRT and the grant were fraudulently forced upon him, and you preserved that. My question is, how can you fault the trial court for not including those assets in the dissolution judgment when it was necessary in your professional judgment to preserve those issues for the law division case? Well, the trial court had already ruled without question that we would not be permitted, and it would not address the issue of the fraudulent transfer. Right. So how could I permit it? I did not permit it. No, but as I said, how can you fault the trial court for doing what you asked the trial court to do, and that is don't address these assets? Don't address the assets because it already said it wasn't going to address the assets. Don't address these assets to preserve my right to subsequently litigate in the divorce court, otherwise my client would be without remedy. I would be faulted for not preserving that issue. But what is the trial court supposed to do when you ask her, do not accept any evidence on the trust involving the condo and the entity that holds a portion of Ellen's interest in her business? Don't consider any evidence. I made no such request. And so she didn't. I made no such request. The motion to bar any evidence was filed by Mrs. Reedy. Right. I simply stipulated in order to frame the evidence and to block the introduction of this issue. It's a plain stipulation. We had a number of stipulations, value, et cetera, et cetera, simply to simplify this case. And I argued initially that this court had to decide the whole case. The amendment had to be made. I mean, I tried every which way to get the divorce court to take it. Two and a half years after the case was filed? I'm sorry? Two and a half years after the case was filed. Well, that's a great question, too, because that's something that was argued by opposing counsel. Keep in mind that I came into the case, and I've got about a year before it was tried. Within six months, I got all the information. I got all the four depositions taken where I confirmed that through the evidence that there was, in fact, a fraudulent transfer, among other things. I took the deposition of the attorney who prepared particular documents. I took the deposition of the evaluator who valued the particular assets. I took the deposition of the accountant who was involved, the accountant for both parties, who was involved in the drafting of all these things and the creation of the quadro and the cupert. And I took the deposition of Mrs. Reedy. I then confirmed that there was, in fact, a fraudulent transfer. It took us about five weeks thereafter to get the transcript, to make sure that we had a valid pleading on file. And we filed the complaint in law division, as I had always done many times before, simply because it was a pro forma, perfunctory thing where you've got a common interest and you have a central facts, central operative facts. I was never opposed in terms of transferring it, transferring a law division complaint to the divorce court. And the reason that I did that is because simply there's no jury in divorce. It's very difficult to get it past the clerk because you've got to pay a fee for jury. And there's no provision for it with the divorce courts down there. The next thing is once you file it in divorce court, you're going to inevitably get lawyers who represent the opposing parties to object to the filing. And they'll file motions to sever. They'll say no, we're not entitled to. There's all kinds of obstructions. And that all involves time. And we were headed for trial. Exactly. So I had no choice at that point. Because what happened was the next six months after it was filed, you've got the trustees that had to come in because they held property and I had to get them in the case to be able to have the court have jurisdiction over them and order certain things to be done. So we pleaded these people. They immediately filed answers in the law division case. The case is still pending, correct? I'm sorry? The law division case is still pending, correct? Law division case is still pending. Okay. And the trial court's order tracked your client's proposed order as it relates to the grot and the other real estate. And you wanted that order or your client wanted that order so that it would not include litigation on those issues in the law division case, correct? Correct. So therefore, you still have a right to litigate those claims in the law division case. Sure I do. But it's a different situation. Because here's where the damage comes in. Okay. You still have an incomplete judgment, a judgment that is unfair. Because what happened, let's talk about the value that's been determined. My damages now are fixed with the value of this property. If we prove that, in fact, there was a fraudulent transfer in the law division, we lose the value of the property. Why? Because 40% of the property was in this trust, in this property. Cuford. Not the Cuford. The grot. You're talking the grot? The business interest? The grot. The grot. Okay. 40% was at the grot. So when it was appraised, naturally there's a, because it's now a majority interest, but because it's owned by two entities, Mrs. Reedy and the trust, there's a 15% discount applied to the value. Which your expert used. Which my expert used at the time because, again, he was dealing with a minority interest. I don't believe my expert used it. The dissolution interest was not a minority interest. It was the expert. I'm sorry. It was their expert that did that. No, actually, I think both experts used the 15% discount. Right. Because we had to. Right. We had to do that. But if the court found that the entire, that there was no discount applied because we knew, now I know, I remember. Okay. So what happens is the experts, both experts, value the property in totality. And then the hypothetical is if, in fact, it stays that way, 60-40, then they apply that 15% discount. So we knew what the value of the property was. So the court accepted a 15% discount for the value of this property. So if we now litigate in the Law Division, we're at 15% of $7 million. Why isn't that part of your damages in the Law Division case? I'm sorry? Why isn't that part of your damages in the Law Division case? You defrauded me out of 100% interest or my share of 100% interest in this business. It could be. And now I'm saying as a result of the fraud, I got less in the dissolution than I otherwise would have been entitled to. What do we do on the impact of the attorney's fees? He was ordered to pay $693, almost $700,000 in attorney's fees. No, Ellen was. Huh? Ellen was. We were ordered to give her a credit of $700,000. Because you had outspent her. Well, we had outspent her, correct. We had to outspend her because we did the yeoman's work. And we – so it's not unusual for the individual who's the economically disadvantaged spouse. See, I think the trial court found that both spouses were financially able to pay their own fees. Yeah, but it's more than that. So what the trial court did at the end of the case was just true up the fees, that you're both going to pay X amount. It's more than that, Your Honor, because contribution has to be made in accordance with certain matters. The trial judge didn't order you to contribute to Ellen's fees. Well, of course she did. It was based on the interim fees. It's a distinction without a difference. Well, there is a difference between interim fees and contribution. You agree, correct? No, there isn't. Contribution is the payment of attorney's fees. Ellen's – there was a credit. I'm sorry. I'm sorry. There was a credit that Ellen got in the buyout. Correct. Right. In the dissolution case. In the dissolution case. But you still have the Law Division case going. We do. So you can still argue all of the value of the grant and the QPRT in the Law Division. No, we can't argue attorney's fees. And we can't argue the effect on other issues in this case. I'm just giving an example. So, for example, contribution, determining contribution has to be made in accordance with 503. 503 factors. 503 factors simply say, look, you use the same process to pay fees as you would in distribution of assets. The same way. Consider all those important things. The ability to acquire assets in the future, the respective incomes of the parties, and so forth and so on. So you use the same thing. And moreover, and we did appeal the issue of contribution. Now, contribution, it's clear. There was no hearing. The judge never heard why we charge more than the other side. And so my client was deprived of basically $700,000 because his wife, Ella, got the bulk of the property and no consideration was done in terms of credibility.   And so I said, well, I mean, shouldn't the court have known about, not known, but shouldn't the court have heard evidence about the fraud? Well, but again, you asked that that evidence, that the fraud claims be kept out of the dissolution case. I respectfully suggest that that was in order to preserve. I was in catch-22. That was to, there was no question. So why don't you address, we're talking about the end result of the denial of the motion to transfer and leave to amend in the dissolution. Why don't you address how your motion to amend complied with the Loyola factors? What complied with what? The Loyola factors. I certainly will. Okay. So 616 factors. Whether the amendment, first of all, we have to understand whether the amendment would cure the defect in the pleadings. There's no question that it would. No, it added new claims. It didn't cure a defect. It added new claims. No, the defect was in the case itself because the court, as mandated by the Supreme Court case of Cone and Leopoldo and thereafter confirmed in Bloom v. Custer in a public decision, specifically said, look, you've got to decide all the issues in this case. And here, you know, the Cone case, for example, encouraged the court to decide all matters incident to the dissolution in a single judgment to the fullest extent of its authority in order of finality. But there's specific law in the 401B. Isn't it correct that the parties can simply ask the court not to resolve a particular issue because they're going to resolve it some other way? I apologize. I can't hear you. Isn't it correct that the parties can ask the trial court not to resolve a particular issue because they're going to resolve it another way or that they've already resolved it? By stipulation. Correct. But there was a stipulation. But not that there was an agreement here. No, there's not. There's no agreement. An agreement after the fact for another purpose is not an agreement. An agreement has to be where there's a meeting of the minds. There's a stipulation. There's a stipulation that the court should not hear it. And that's all that the agreement was. Court, don't hear this issue. You've already ruled. And there's no question about it. My concern was simply to preserve this action in the event that this court, for some reason unbeknownst to me, affirmed the decision. Because it's black letter law. No judge sitting there should have allowed it. And, in fact, a judge cannot hear, cannot omit property from consideration in a divorce case, whether it's by mistake, whether it's by omission. And I argue this. We argue this. They never addressed this. They still haven't addressed this issue about can a court enter a partial judgment and disregard the Supreme Court case of Cohn, Kuczywinski, and Coster v. Bloom, and the 401B. And why not allow the amendment? It wouldn't have made any difference. I said I was ready. The only thing we needed to do was add the parties once again. And so what if it caused a short or a small continuance? Wait a second. You added a couple of months earlier, before trial, how many new defendants? Five? No, we added one. We added the wife's sister, the wife's daughter, and then we added the cop who conspired with the wife to transfer its property. So those new defendants then should come over to the divorce court, and you say I'm ready. I've taken all the depositions I need. I've done all the discovery. I'm ready. Wait a second. We're not. But to bring about the ends of justice, look at what we had to go through. We had to go through a trial. We had to go through an appeal. We had to go through why? To what end? Just simply because it wasn't I in that short year that I had. No, it's your client. Your client is the one who's charged with the delay. He says on the Naples condo, I had no idea that I only had a 10-year life interest and that if we divorced, Helen and her daughters would get the property. I had no idea. All I had to do was read the paper to find that out. And on the grant, again, you read the document, you see 30% of her business interest is in that entity. What more do you need to know? He says I'm totally surprised by this. My client was an old, feeble... He's not looking so old to me. Well, he was... Well, he's not old to me either, but I'm saying in terms of life, ex-history teacher who had very, very poor memory. It was difficult to get information from him, as the court observed. And so it wasn't my client, Judge. It was I who was representing the client. And so in this particular case, it's almost commonplace. And I say, why not grant the amendment? We complied with 2616. Let's get back to this. Would the amendment have cured the defect? Of course it would have. Was this a surprise? Or did it really prejudice the other party? That's the second problem of the amendment law. Of course it wasn't a surprise. They knew where I was going six months in advance. I took these depositions, and they knew where I was going. I uncovered a letter, an email. I uncovered a cupid that had been changed, where generally speaking, a spouse is not a beneficiary of a cupid. And the letter, this initial draft was, and then it was intentionally changed so that the spouse would be the beneficiary of this cupid. And in the seven years or ten years, whenever this cupid expired, she would then come into ownership of this Miami condominium that was worth $3 million. And your client signed off on it. Sorry? Your client signed off on it. My client didn't know what he was doing. And that was our plea on their own. He signed that in 2012. He signed that in December 2012. So it was a couple months, it was like nine months before the divorce was filed. Right. But he did sign it. It was Christmas, over Christmas, and he was rushed and he never read it. He trusted his wife. Counsel. She was the business head. When the judge says in the divorce case, look, I'm not going to admit any evidence about the cupid, and you say, wonderful, how are we supposed to believe that that was the judge's error? That's in the transcript. Your answer was wonderful. Yes. When the motion in lemonade was... We're not going to admit anything. Right. When the motion in lemonade came up, you said, I don't mind. I saw it. That's in the transcript. I saw it. How can we now look at this and say, oh, that trial judge in the domestic relations court should have done this anyhow. It was a mistake for her not to do it anyhow. When you've still got, and we all know, you've still got the law division case pending, and you can explore all of these issues in the law division case, the value of the two trusts and the effect of the two trusts and whether or not they were fairly ordered. I would not have been able to do that. I would not have been able to proceed. Because at that point, unless that evidence, if that evidence came into the law division case... Counsel. Yes. You want to eat your cake and have it too. You want to have the issue decided in the domestic relations court and also be able to say, it's litigated now, and, oh, by the way, if they made a mistake, we'll just do it in the law division. All right. I don't think that's the way it works. Well, I know, perhaps not. Perhaps not. Perhaps it doesn't work that way, Judge. But you still have an incomplete judgment. But you chose the law division as the forum for the torts. You chose the law division as the forum for the torts. If you wanted to discuss the valuation and the split up of these two trusts, you could have done it in the divorce case at any time and amended the divorce case with just the trust issues any time you wanted to, but not the day before trial, not the week before trial. What do we do when we have an invalid judgment? Well, it's your term that it's an invalid judgment. You're saying that. It's by this particular issue is a matter of law, not a matter of fact. This isn't discretionary with the court. Which you agreed to, to leave these two things out. I'm sorry? You agreed to leave these two things out. Right, but that's factual. Right. That's factual. Right. But this is not a matter of fact. This issue is a matter of law. This court must decide as a matter of law. Did the judge enter a complete judgment? Or, by law, by looking at Kudziwinski, by looking at Cohen, by looking at Koster, by looking at Thorwald, did this court, in accordance with law, enter a complete judgment? Not factual. My thinking, my rationale, my bonus are not at issue here. Neither are my clients. That's the point. So I think that's all the time we have.   Thank you, Mr. Garner. Okay. We have gone a little beyond your ten-minute estimate, as I suspected. Do you want to wrap up, Mr. Garner? I'm sorry? Would you like to wrap up? I think I have. I think I've answered all of your questions. Thank you very much. All right. Thank you. Ms. Garner? Again, good morning, Your Honors. Simply put, John now has buyer's remorse with respect to strategy decisions and trial tactics that he consciously made with his counsel, especially as to the stipulation we've just heard about that his counsel proposed, drafted, and agreed to, and notably never mentioned not once in the opening brief to this Court. It is not the function of Your Honors to correct deliberate decisions made by a litigant simply because they didn't result in the outcome that they thought that they would. It's improper now for John to challenge the alleged error that he himself created by his tactical and strategy decisions, and which he now recasts improperly as error of the Court. No, he said once my effort to either consolidate or stay or transfer or amend, and once my efforts to bring these new claims into the dissolution proceedings were unsuccessful, what choice did I have? Yes. Well, Your Honors, in his reply, that's the first time that we even get an acknowledgment from counsel and from John that the stipulation even existed. And they try to back away from it, even though acknowledging that now it does exist, they try to back away from it to say, well, they were out of options. But again, you have to go back to the beginning of the story. If he was out of his options, it was because it was a result of his own strategy. If he was in a box, he put himself in that box on his own based upon his conscious choice to file first in, as we relate in our pleading, he first filed a petition for legal separation in the Domestic Relations Division very shortly before, I believe it was only six days, prior to filing the Law Division action in the Law Division. And this was a basis to speak to your questions about the timeliness of the amendment and whether he satisfied all of the criteria under We vs. Chicago Transit Authority, a Supreme Court decision which lays everything out. No, he did not. As Your Honors noted, there was no curing of a defect in the pleadings. Now, again, the timeline here is very important because John filed his petition for legal separation in the trial court at the end of March in 2016. Six days later, he goes to the Law Division, files a completely new cause of action, eight new defendants. You asked how many there were, eight new defendants, six new claims, asking for millions of dollars in relief. And then he proceeds to file that in the Law Division and then decides shortly after, well, I'm going to file a motion to consolidate the action I just filed in the Law Division and I am going to request a motion to consolidate into the Domestic Relations case when he just filed his own petition for legal separation in the Domestic Relations case only a few days before. That's one of the things that the court looks to as to whether something is timely or not. Did the party know at the time that the original pleading was drafted, so when he filed that motion, the petition for legal separation, did he know that he was going to file the Law Division action? I think it's only reasonable that he didn't know that he was going to do it. It was final six days thereafter and no excuse was offered in explanation for the initial failure. There's no doubt that he knew about that. Are you suggesting that if he had come in on a motion to amend in the dissolution proceedings as his first gambit, that that should have been granted? Your Honor, no. No, we don't believe that it should have been granted under any circumstances because just that the amendment was improper, it was untimely. He came four to five days before trial knowing that trial was already set in the Domestic Relations case. And this is part of why Judge Walker found that there was substantial prejudice and why she properly denied the amendment in this case. She found that the amendment was untimely. And I'll quote from what she said in the record. She said, John could have some time ago easily have filed his claims of fraud and conspiracy, certainly, and asked for joinder of those new defendants in this case. Now, that was an exercise of her sound discretion. Judge Walker knew this case the best, rather than anybody else. She found that John was on notice of the grant in the cupra years before and could have filed a claim when he first learned of these trusts and their impact on the Maryville estate. He filed his law division case, and after the cases were not consolidated, he then chose to ask that he be allowed to amend his counterpetition. Yes, yes, he did. So he was acting timely to that extent. He thought he had another route, and when that route didn't work, he decided to go back to the Domestic Relations Court. Yes, Your Honor, I understand. The thing is that we can't lose sight of the fact that he did this all at the 11th hour, knowing that the Domestic Relations case was set for trial in 45 days, after two and a half years of litigation. They were very close to the end of that case, and as we highlighted in our brief to Your Honors, John made it very clear, and he also states it very frequently in his brief to Your Honors as well, and it's front of record, he did not want this divorce. He says by his faith that he couldn't have a divorce. He said that he did not want to have the divorce. But this is not about whether or not he wanted a divorce. This is more about whether or not the trial court abused its discretion. Oh, correct. But this gives you background as to what was going on here, and why all of these maneuverings. Right, so why not want a divorce has nothing to do with whether or not the trial court abused its discretion. Let's stay with the issue. But it has to do, Your Honor, with the delay, okay, because in our perspective, reasonably, the only way that you can look at all of these machinations for him to go into the law diversion and then ask for a case that he just filed to be consolidated into the divorce case. He went that route. That took almost, I believe it was almost two months to go through that. As Justice Mason mentioned earlier, she asked Mr. Gwinn to respond to the Loyola factors. Why don't you do that as well? To the, okay, so in terms of the amendment? Yeah. Okay, so whether it would cure a defect in the pleadings. No, Judge Walker absolutely found correctly that it would not cure a defect in the divorce pleadings because the law division case was a separate matter. The claims were in their infancy, and he asked for them to be tried by a jury, which is something that is not done in a domestic relations case, right? Those are all done without a jury. Would it prejudice the party? Judge Walker correctly found that there was substantial prejudice to Allen here because as in Judge Walker's words, Allen was entitled to get her divorce without further delay. And Judge Walker agreed with Judge Flannery in that regard because he said it was also prejudiced to consolidate those cases at the 11th hour. The next thing is, is it timely? The amendment was untimely, again, as I was saying before. Judge Walker found, and she knew this case better than anyone else, that John could have some time ago easily have filed his claim of fraud and conspiracy in the domestic relations case, and he chose to wait until the 11th hour and then add eight new defendants, six multi-million dollar claims, again, with the background knowing that John did not want to get divorced. And he said in a deposition that he would not cooperate with it. And respectfully, the only reasonable conclusion as to all of these procedural machinations back and forth in different divisions and here and there and taking inconsistent positions, one day they say that the domestic relations case should take the lead before Judge Flannery, the very next day they go before Judge Walker and say that the law division case should take the lead. These inconsistent positions, reasonably the only reason that we can see is because John did not want to get divorced and they were finding everything that they could to have it delayed. Now, the fact that this all then at the end didn't turn out the way that John had hoped it would, that is not for your honors to correct. He made conscious decisions, the major one of which was entering, proposing, and entering that stipulation and order before Judge Walker. Judge Walker, your honors, properly adjudicated all issues that were before the court. Per the party stipulation and order, to bar the introduction of evidence relating to the law division claims, Judge Walker adjudicated everything before her and nothing was left reserved at all. And it was not a partial judgment. Nothing was reserved in that judgment. She honored the stipulation agreed to by the parties. And now John does not want to honor that agreement. And if your honors say that that is fine and reverse on that basis, then really the question becomes then what value do stipulations then have? He voluntarily, he proposed the stipulation, he entered into it, he drafted it, he entered into it, and that was what left Judge Walker with. But you agree that under normal circumstances the trial court should have considered the grant and keep it in the property distribution. Well, those were the, in 2012 when the grant. That's not the question, though. Do you agree the trial court under normal circumstances, but for the agreement that you're referring to, that everybody's referring to, the trial court would consider that in the property distribution, correct? No. Because the grant, those properties that were put into the grant in 2012, they took them outside of the marriage. Right? They're in a trust. They're in a separate trust that's outside of the marriage. They wouldn't be part of it. They're not marital property. They're not non-marital property of either party. They were taken outside and put into an independent irrevocable trust. So they're not part of the marital estate. They're not marital. They're not not marital. They're outside, and that's what we explain in our brief as well. I also want to go back to, I think counsel said that the court did not make a finding of credibility. That is incorrect. In fact, Judge Walker specifically found that it was Ellen who was found to be highly credible. Those are the words of Judge Walker, to be highly credible. She didn't find him found to be incredible. No, found him to be fairly credible. There was some loss of memory. But they found Ellen to be highly credible. And for her to make that distinction, I think that's just something notable for your honors. Your honors also discussed with counsel the 15 percent discount. And, again, I think that that was covered, that the experts for both parties concluded that a 15 percent discount for lack of marketability was proper. And John's own expert opined that the same rate was appropriate also for Mariah as it was for Amphotech. And, again, John cannot now complain that the circuit court erred in adopting the opinion of his own expert. If that's his argument, then, again, it's buyer's remorse. That's what we have here, your honors. With respect to, let me just make sure I covered everything. Okay. With respect to the attorney's fees, we talked about the attorney's fees and whether there was contribution or whether this was an allocation. Your honors, it's our position that the circuit court made a proper final allocation of attorney's fees in the dissolution judgment. And there is a difference between allocating the fees that have been advanced as part of the marital estate and contribution, which is a fee-shifting concept for leveling of the playing field. Now, in assessing whether the ruling on attorney's fees is correct, your honors need to look at two rulings, not just Judge Walker's ruling in paragraph M of the dissolution judgment. You also need to consider Judge Haras's prior ruling of April 13, 2016, that order. And that's at volume 5, C1117-19. And that's where you can find that order. That order is very, very important in this case, your honor, because there, that was an order that was entered on John's petition for interim and prospective fees. A hearing was held at that time, and Judge Haras entered an order that said all payments made for interim fees and costs are made without prejudice to the final allocation and, quote, shall be deemed to have been advances from the party's marital estate, end quote. The shall is very important here, your honor. This evidences the intent of Judge Haras that these interim fees were meant to be advances from the marital estate that were meant to be trued up at the end of the case. It's not contribution. Contribution is a different concept. Now, Judge Haras's order was enforced by Judge Walker in the dissolution judgment. And John then mischaracterizes Judge Walker as awarding LM fees at the conclusion of the case. And again, as we make clear in our brief, the fact is Judge Walker allocated the interim fees between the parties as advances from the marital estate. And this is governed by Section 501C12 of the IMDMA, which talks about final allocation and that unless otherwise ordered, anything that's considered to be an advance from the marital estate shall be deemed to have been an advance, and then it shall be trued up at the end and any overpayment shall be remitted back to the appropriate party. And here at the end of the case, John's attorneys had fees of about $628,000 more than Ellen's attorney had. So Judge Walker looked at that and then she trued it up and allowed Ellen a credit of that amount back against the note that she was supposed to give John to buy him out of her share of the business assets. What was the value of the note, again? I'm sorry? What was the value of the note? Of the... You said that the judge awarded a credit of $628,000, because it seems to me that the credit should have been half of that as opposed to a full credit. If John's fees were $628,807 more than Ellen's fees, and it's basically an advancement from the marital estate, then it seems to me that John should only be required to pay back half of that. But he still overpaid. He outspent her. I understand. So to true that up and make that even... So then should he only be required to reimburse half of that? No. Because it was an advancement from the marital estate anyway. Right. Okay, so... No, it was. Absolutely. Right. Absolutely. Okay, so if the exact amount that John overspent Ellen by is $628,807, it seems as though to me, and I'm asking you to correct me if I'm wrong, that John should have only been required to contribute half of that amount back. And I realize that Judge Walker is also a certified public accountant, as I am. But that's how I'm seeing the numbers, so help me. Okay. Well, respectfully, I would disagree with that because if he would only be remitting half of it back, then there would still be an imbalance in terms of getting it back to an equal part. No, the money belongs to the marital estate. The money, the $628,000, even though Ellen paid it, it was as much John's money as it was Ellen's money, correct? Am I correct? Yes. Okay, so then if now we're deciding how do we now make Ellen whole, it seems as though John should only have to pay half of that amount back to Ellen. Because originally the money came out of the marital estate, but John received the entire benefit of the $628,000. Now, if he pays back only half, then he gets half the benefit, Ellen gets half the benefit or half the detriment, then he gets half the benefit, half the detriment. Well, the transcript shows from September 27, 2016, from the hearing that the parties had on the fee issue, Judge Walker looked at the imbalance between the fees, and she said that in her estimation that she would try as much as she could to equalize the fees. Right, so just walk through it with us and walk through it with the justice this year. So if she's going to do that, then how should that amount be broken down? You tell us. Well, I still believe that what she did was absolutely correct, because the money had already been spent. It was already gone. But whose money was it? Well, it was money, it was from the marital estate. Absolutely. Okay, so John already is, that half of the money that was placed into the attorney's fees for Mr. Grunt, I assume, or his law firm, half of that belonged to John already. Correct? Yes. Even though Ellen paid it, half of it belonged to John, right? Yes, but it was... So now if John has to pay it back, he only has to pay back half of that. Well, I think that we disagree. We believe that what Judge Walker did here was correct in terms of crediting it back, crediting the entire amount back to the marital estate because it was an overpayment, and that's the way that it trued up at the end. So we believe that her analysis was correct here. Can you, in their brief, John talks about the two life insurance policies, $693,000 in life insurance, the cash value of the life insurance policies, and he says he cannot collect on the cash value of the policies because they're owned by the trust. Can you explain how that's supposed to be a benefit to him, if Judge Walker gave him the value of the trust, the insurance policies, but he can't get at it? How are we supposed to deal with it? Well, I don't think you do deal with it, Your Honors, because as we explain in the brief, the way that this was, the way that the policies got on the balance sheet, the proposed judgment, so Judge Walker had both parties submit proposed judgments and balance sheets. John submitted a proposed judgment to Judge Walker, which shows that he himself viewed these policies as marital and requested that they be awarded to him, and that is in the record. It was his decision. Yes, and so he can't complain now that the circuit court awarded him the relief that he himself requested. These are life insurance policies on Ellen, on Ellen's life? These are life insurance policies on, it was on Ellen, right? Correct. And in his reply, John claims that the fact that he put it on his balance sheet shouldn't be used against him because he simply relied on Ellen's balance sheet and he basically copied off of it. Your Honors, there's no evidence in the record regarding this policy. I mean, really, there was no evidence that was introduced before Judge Walker regarding this policy. John failed to reduce that evidence, and in his brief, you note, he only cites to the balance sheet and only to that one line that it's on the balance sheet. Yet now in his reply brief, he cites the Blackstone case and says that evidence regarding property is, quote, an obligation existing with both parties. But at the same point, he's saying that it's all Ellen's fault because she put it on the balance sheet and he was just following along with her, and I think that's consistent. That is the tap that John and his counsel have been taking, and we've talked a little bit more about that, too. It was like when he read the grant and he read the cupert, then he's charged with knowing what the document says. Ignorance is, you can't say, well, I didn't understand it. You read it, you're charged with the duty of reading what you sign. And here, again, it's the same type of response where they're saying, well, you know, we followed what Ellen did. But yet he cites the Blackstone case, which says it's an obligation of both parties. So he undermines his own argument. And frankly, if John's lawyers made a mistake regarding the life insurance policies and whether they should have been on the balance sheet and awarded to him, that's not your role to correct that. John has other avenues if that's the case.  So I believe that we've covered all your questions, Your Honor. Just to leave you with one final note, it must be remembered that John does have a viable cause of action that's presently being litigated in the law division. So he is not without a remedy for the claims that he is asserting here in this case, and which he claims were incorrectly excluded from the domestic relations. Okay. And again, it's by his remorse at this point. He agreed to it, and now he's not happy with the outcome of what he agreed to. Thank you so much, Your Honors. Appreciate the time. Thank you.  Mr. Grun, briefly. Mr. Adams. Okay. Good morning, Your Honors. I'm David Adams. I'd first like to respond to the insurance question. The fact of the matter is, is that we had relied on their discovery. That very same sheet was what they presented to the court as the situation. And so while it's certainly true, and I pointed it out in our presentation, that it is an obligation incumbent upon both parties. Ellen was in control of all of the financials as the economically empowered spouse. She handled this. And so we found out about this through discovery, and she had indicated on her balance sheet that this was an asset of the marital estate. Since when do spouses who are involved in a property division dispute say, okay, you put it on your balance sheet. I trust you. I'll put it on mine. Since when does that happen? Well, Judge, I think to a certain extent we can rely on discovery that was done. And here, at the end of the day, what she's trying to do. Right. And you had the opportunity to discover if there was a cash value of these policies that could have been realized by Mr. Reedy, right? And he says there isn't. Why would he put it on his balance sheet? The issue here, I think, Judge, is one of an unjust enrichment here. She's going to walk away with ñ she's now in a position in the trial court in Post-Decree to be able to say, I can't turn these policies over to you. And he's been ñ I mean, it's about $775,000 that he was awarded of property. I mean, that's the irony here is the entire history of this case is they're trying to bring in certain property, whether it was the Gratz, the Kuberts. And we've heard a lot of fact discussion about, from opposing counsel here, as to whether those things were ñ whether they even should have been in the marital estate. And the irony is here is that we tried to bring all these assets in, and then the trial court here awarded assets which probably were outside of the marital estate to our client here. And the net result, you know, of all of this has been this cascade of error. And I think that this insurance issue really needs to be addressed here. And they represented as much to anyone. This is an issue ñ if you want to call it an issue of mistake, it was one of mutual mistake then. They made the same representation to the court. And I don't feel that equity allows them to now be able, in Post-Decree, to say, we don't control these trusts. You don't purchase this money. I guess I'm going back to the question we started out with. When Mr. Reedy includes on his balance sheet life insurance policies that he proposes be allocated to him, what's the trial judge supposed to do? What error can the trial judge commit by saying, okay, Mr. Reedy, I'm going to award you those policies? But the question, I think, really goes to who's responsible for that error. And that was Ellen who was responsible for that error here. And whether it should be permitted to continue when we all know now what had happened here. They've never denied this, not in their briefs and not in subsequent proceedings, that these ñ in fact, it's their position now that these are not part of the marital estate. And yet they're going to be like, well, you know, John should just simply suffer a $775,000Ö But wait a minute. The depositions were taken before this judgment was made by the judge and before the balance sheet was considered by the judge. So if they found out about it in the depositions, why didn't they say, hold it, hold it. We've got to change ñ we've got a problem here with these insurance policies. They're not part of the marital estate. You just said that in the deposition. They're not part of the marital estate. So, Ellen, we don't want them to be on our balance sheet because we can't get at them. I mean, you knew that. Well, I don't know if we knew that from the depositions, Judge. So you end up with a balance sheet to the judge and you know something that she doesn't know. They don't give you crystal balls when you're a judge. I mean, you have to take information that people give you. You have volunteered this information. You've put these insurance policies on your balance sheet. The judge looks at them and says, okay, that's what they want. But you already know that you can't get at them. So why didn't you pipe up and say, hey, wait a minute, we made a mistake? Well, I can't speak to that. What I think is the important issue here is that I don't know that we learned about that in the deposition, in the depositions when we were doing that. But what I would say is this, is that they've made a misrepresentation to the court. Well, Mr. Adams, you just said you learned about it in the depositions. So did you or didn't you? That we learned about this in the depositions? That's why I asked my question. When you said we learned about it in the depositions. Well, I think I misspoke. What I'm suggesting is we learned about this from Ellen in discovery, okay? And this was represented to us as being part of the marital estate. And they represented this as well to the court, okay? And as a consequence of that, it ended up being erroneously beyond the judgment. And now we're in the position where, you know, we can't access these assets here. And I think that that's fundamentally a very unfair and unjust situation here. You didn't think to investigate it, ask for copies of the policies, look at what they said? Well. You're just going to take Ellen's word for it. It's my understanding that this was, that that was our understanding as well at the time. That's why we put it on the balance sheet. And during discovery, you never thought to ask for any detailed information about it? Did you get any detailed information about these insurance policies during discovery? Well, I believe that the information that we got was from, was that these were part, this was all part and parcel of the marital estate. During discovery, that's what was, that's what happened? Well, prior to the trial, I wasn't involved in the discovery process, Judge. I can't speak to that, to that direct point. But it's my understanding that we were given this information and that we relied upon it. And that not just that we relied upon it, but that they represented it as well. And to the extent that I would, to the extent that I think that the court is, well, that in your query, that you're suggesting that somehow we should, where, we put the, oh, okay. Mr. Brum pointed out that we put the cash value on the balance sheet here. And so that is a very different issue than actually the policies themselves. Right. So I think that the issue is, is whether Ellen should be able to walk away from all of this and not, and be able to keep the $775,000 that needs to be paid over to John. And it was clearly the trial court's intent that he got, that he receive that value. And I don't think anyone can deny that. I think the, another point I'd like to make here, with respect to some of the things that Mr. Brum talked about, and I think the overriding issue here with respect to, as he called it, the gaping hole that occurred here in the judgment, is whether we have a right, whether we have a right in the law division now, and whether we have that right at that point, should not have precluded John from dealing with these facts and these issues as there's considerable crossover between them. For example, what we were trying to say, when you're trying to figure out what the marital estate is, and John should not have been precluded from stating, well, these assets that went to the grant, and to the Cupert, and to these other things, were all marital, all should have been marital assets. Well, he would have been fine with the Cupert not being a marital asset as long as he inherited it under the trust. He would have been fine with that, right? Here's the thing, is, you know, counsel here made a lot of factual arguments. We should have not been, we wanted to make the factual argument that he was tricked into signing the Cupert, that he was given one version. I guess we've been over this ground, and I don't want to go over it again. If he thought he was tricked into signing the Cupert, he knew he was tricked as soon as he saw its provisions, right? As soon as any lawyer representing him saw the provisions of the Cupert, John would have said, I had no idea that I only had a 10-year life estate and that it would go to Ellen if we divorced. He had to know that, right? Are you saying when he signed the agreement? When a lawyer representing him in the divorce proceedings looked at the Cupert and said, do you know that you only have a 10-year life estate in this condo in Naples, and that Ellen will inherit it even if you get divorced? He would have said, no, I had no idea. But that's exactly what happened here. Right. And so he would have known that early on in these divorce proceedings, and yet he waits until six weeks before trial to say, now I want to litigate this. Well, no, the thing is, Judge, is that John, we weren't able to discover this thing. He didn't discover it until our firm got involved in this thing, in this case. And where is that in the record? Where is that in the record? There was no discovery done for a year? None? No documents exchanged? Well, I can speak to the fact that we were the ones who had discovered that because we had gotten involved in the case about a year before it went to trial. Right. Where is it in the record that the lawyer before you did not know what the provisions of the Cupert were? I don't know that there was an indication that the lawyer before us was, but I think in the pleadings and when we went and asked for, I believe it was when we asked for, was it either the consolidation or it was rather the motion for leave to amend, that we learned about these things only after we got involved and after doing these depositions. And as Mr. Grund indicated, there was this smoking gun e-mail from a Wendy Crawford Schultz which showed that Ellen was engaged in divorce planning prior to filing the divorce. It was only through our efforts there that these things were uncovered. What a shock. Yeah, what a shock. Schultz says I'm going to plan ahead? Well, I think to the extent that, yeah, it is shocking that someone would remove assets deliberately from the marital estate and try and secrete them on the side so as to diminish it. That's what you're going to litigate in the law division. Pardon me? The law division. That's the issue you're going to resolve in the law division. Yes, but I don't think we should have been precluded. And I think throughout the briefs they don't talk about, and the issue that I tried to stress here in the brief is you've got Cone, you've got Leopondo, you've got that appellate decision that we had in Bloom v. Koster, okay? And all of them speak to the same issue that you need to have a complete judgment. And what occurred was is we were precluded from being able to do that. And as a result of that, you know, all of these assets have been, as I argued in the brief, these divorce judgments are like tapestries. You have to look at, you know, a lot of the factors that you use for determining maintenance and for allocation of property are also used in contribution and vice versa. And when we weren't able to get all of that in, a lot of errors occurred. I won't retell the same ground, but it created a discount error where Ellen really ends up still through the trust and through the piece of the company she still owns, she still has 100% control of it, yet the property ended up being discounted because she in theory didn't have that. And I think we should not have been precluded from having a proverbial Dane court and speaking to the issues of what these assets were that were removed. And that's, and again, and that's what resonates. That's what animates these decisions like Cone and Leopondo is that you need a complete judgment. Everything has got to be on the table. And I think if this court should walk away with anything is that we made every effort that we could to try to pull all these other assets in, to get these other actors in who were holding on to them, and to put it all under one tent. And if we had been granted the consolidation or alternatively relieved to amend, I think we wouldn't be here today. And I'd like to thank the court for your time. I appreciate it on behalf of my co-counsel here and wish you a good day. Thank you very much. Thank you all for your arguments and for your excellent briefs. We will take the matter under advisement.